ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona
Jane L. Westby
Assistant U.S. Attorney
State Bar No. 017550
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: Jane.Westby@usdoj.gov
Attorneys for Plaintiff

FILED
2018 OCT 31  AM 8:40
CLERK US DISTRICT COURT
DISTRICT OF ARIZONA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

United States America,

Plaintiff,

vs.

Robert J. Moss,
(Counts 1-10)
Jeffrey D. McHatton,
(Counts 1-10)
Robert B. Sproat,
(Counts 1-10)

Defendants.

CR18-2220TUC RM-EJM

INDICTMENT

Violations:

Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud)

Counts 1-10

SEALED

VICTIM CASE

**GRAND JURY CHARGES:**

At all times relevant to this Indictment:

**Introductory Allegations**

1.  Defendants ROBERT J. MOSS ("MOSS"), JEFFREY D. MCHATTON ("MCHATTON"), and ROBERT B. SPROAT ("SPROAT") were residents of Arizona.

2.  The Fortitude Foundation ("the Foundation") was registered as an Arizona 501(c) non-profit corporation.

3. Beginning on or about January 2008, Defendant MCHATTON was the President of the Foundation.

4. Defendant MOSS was a Director or represented that he was a Director of the Foundation from on or about June 2012, to on or about August 2016.

5. Defendant SPROAT was a representative or Director or held himself out as being a representative or Director of the Foundation from on or about June 2012, until on or about August 2013.

### The Joint Venture

6. On or about May 12, 2012, Defendants MOSS, MCHATTON, and SPROAT, as representatives and officers of the Foundation, entered into a Joint Venture Funding Agreement between the Foundation and entities collectively referred to as "Wycliffe" to allegedly engage in three (3) business ventures: 1) the recovery of hidden gold in the Philippines; 2) the buying and selling of gold; and 3) the procurement of low-alpha lead in South or Central America and its sale to semi-conductor manufacturers.

7. As part of the Joint Venture Funding Agreement, Defendants MOSS, MCHATTON, and SPROAT agreed the Foundation would borrow $15,000,000.00 from qualified investors allegedly to fund the three business ventures described above in paragraph six (6). Defendants MOSS, MCHATTON, and SPROAT agreed the Foundation would provide $14,000,000.00 within 30 days of the date of the agreement, i.e. by June 12, 2012.

8. As part of the Joint Venture Funding Agreement, $12,500,000.00 of the total

$15,000,000.00 that Defendants MOSS, MCHATTON, and SPROAT agreed the Foundation would fund was allegedly for the Foundation's purchase of 250 Class A Revenue Sharing Units for the hidden gold recovery investment (hereinafter "Philippine Gold") and other business objectives of Wycliffe.

9. As part of the Joint Venture Funding Agreement, $1,500,000.00 of the $15,000,000.00 that Defendants MOSS, MCHATTON, and SPROAT agreed the Foundation would fund was allegedly for the Foundation's purchase of a 20% share in the "net revenue cash stream" for the low-alpha lead buying and selling activities.

10. By June 12, 2012, the Foundation had not provided any of the funding as required by the Joint Venture Funding Agreement to purchase the Revenue Sharing Units in the Philippine Gold investment and the 20% share in the net revenue cash stream for the low-alpha lead buying and selling activities.

11. However, beginning on or about June 21, 2012, Defendants MOSS, MCHATTON, and SPROAT fraudulently promoted and sold securities in the Philippine Gold investment and the low-alpha lead investment, stating in the securities that the investment sold was based upon the Joint Venture agreement between the Foundation and Wycliffe.

12. As stated in the promotional materials and the securities sold by Defendants MOSS, MCHATTON, and SPROAT, the profits from the Philippine Gold recovery investment and the low-alpha lead investment were supposed to be distributed based on the amount invested by each investor.

3

13. The victim/investors in the Philippine Gold and the low-alpha lead recovery ventures invested money, but did not perform any duties.

<u>The 2008 California Order to Desist and Refrain against Defendant MOSS</u>

14. On August 26, 2008, the State of California, Department of Corporations issued a Desist and Refrain Order against Defendant MOSS, ordering him to refrain from offering or selling any securities in the State of California. In the Desist and Refrain Order, the California Corporations Commissioner found that Moss had committed securities fraud.

15. On or about September 12, 2008, DEFENDANT MOSS requested a hearing challenging the Desist and Refrain Order; however, on October 27, 2008, DEFENDANT MOSS waived his right to an administrative hearing and "let the earlier Desist & Refrain Order stand...."

16. Before the victims invested, Defendant MOSS failed to disclose to the victim\investors in either the Philippine Gold recovery investment or the low-alpha lead investment that MOSS had received the 2008 California Desist and Refrain Order.

<u>The Solicitation and Sale of Securities to Victim\Investors</u>

17. Defendant MOSS, MCHATTON, and SPROAT met some of the victim\investors at or through a Bible study meeting at a church in Phoenix, Arizona.

18. The Foundation was described to investors as seeking "to represent the Father's heart in the world by providing philanthropic resource facilitation in food, water, shelter, and sustainable energy sectors..."

4

19.     In exchange for their investments, each victim\investor in the Philippine Gold and low-alpha lead projects received a Promissory Note and a Memorandum of Understanding (collectively, "Investment Contracts") from the Foundation and executed by Defendants MOSS, MCHATTON, and SPROAT. These documents were made by Defendants MOSS, MCHATTON, and SPROAT by fraudulently using the name of the Foundation to create the appearance that the investments were legitimate.

20.     In the Memorandums of Understanding Defendants MOSS, MCHATTON, and SPROAT represented that the victim\investors would receive 500% of their original investment amount from the profits of the joint venture agreement between Wycliffe and the Foundation.

21.     Defendant MOSS, MCHATTON, and SPROAT's statements that victim\investors would receive 500% returns was a material misstatement for which they did not have a reasonable factual basis because: (1) the Foundation had not provided the $12.5 million to $15 million of funding required by the Joint Venture Funding Agreement for the Philippine Gold and low-alpha lead projects; and (2) the Foundation had no revenue, no income and no assets from which to pay such returns.

22.     In most cases, in the Memorandums of Understanding, Defendants MOSS, MCHATTON, and SPROAT represented that the Foundation would repay the victim\investors in just 90 days with an option for the Foundation to extend that repayment period by an additional 90 days at its sole discretion, with interest in the amount of 9%, payable after the first 90 days.

23. These false statements and false guarantees that the victims would receive these extraordinarily high returns and a quick return of principal on their "investments" induced the victims into investing their money.

24. In the Investment Contracts, Defendants MOSS, MCHATTON, and SPROAT advised the victim\investors that up to 15% of the victim\investor's funds would be retained by the Foundation for "operating funds and fees permitting [the Foundation] to properly monitor and manage said business ventures and investment opportunities" or for "operating capital."

<u>The Hidden Philippine Gold Investment, Part I</u>
<u>Victim\Investors T.B. and P.B.</u>

25. On or about the spring of 2012, at a weekly Bible study meeting at a church in Phoenix, Arizona, Defendant SPROAT introduced victim\investor T.B. to Defendant's MOSS and MCHATTON.

26. Defendant MOSS subsequently gave victim\investor T.B. a Financing Proposal Summary for the Philippine Gold investment, seeking to raise $250,000.00 for the recovery of gold bullion from two sites in the Philippines.

27. The Financing Proposal Summary Defendant MOSS provided falsely represented: "The total amount of time necessary to complete this recovery [from the first site] and generate proceeds therefrom will be less than 120 days from the time that full funding is in place." The Financing Proposal Summary further falsely represented that an investor who provided the entire $250,000.00 would receive a total estimated return of $11 million in 6 to 24 months.

28. On or about June 21, 2012, victim\investor T.B. wired $250,000 to Defendant MCHATTON's Quicksilver Realty JP Morgan Chase account ending in 4993 to invest in the Philippine Gold recovery.

29. On or about June 21, 2012, $225,000.00 (consisting of $224,580.00 of victim\investor T.B.'s funds) was wired from Defendant MCHATTON's Quicksilver Realty JP Morgan Chase account ending in 4993, to an account associated with Wycliffe.

30. On this same date, June 21, 2012, a $7,500.00 check drawn from Defendant MCHATTON's Quicksilver Realty JP Morgan Chase account ending in 4993, was deposited into Defendant MOSS's account for his company TMC Consultants, JP Morgan Chase account number ending in 7838. At least $7,080.00 of the $7,500.00 check consisted of T.B.'s funds.

31. T.B. invested with Defendants MOSS, MCHATTON, and SPROAT because he wanted to make money and help others. Victim\investor T.B. was attracted to the project because of the sizeable return, the quick turn around, and because T.B. believed that the groups involved, including the Foundation, were Christian groups trying to do good.

32. Defendant MOSS failed to disclose to T.B. that MOSS had received the 2008 California Desist and Refrain Order finding that MOSS had committed securities fraud before T.B. and P.B. invested.

33. Although Defendant MOSS represented through the Financing Proposal Summary that "The total amount of time necessary to complete [the first gold] recovery and generate proceeds therefrom will be less than 120 days from the time that full funding

is in place," and T.B. provided the full $250,000.00 of funding, T.B. has received only a de minimis $2,000 interest payment and no return of his $250,000.00 principal.

### The Low-Alpha Lead Investment

34. Between on or about October 31, 2012, and May 23, 2013, Defendants MOSS, MCHATTON, and SPROAT solicited and sold investments in low-alpha lead to victim\investors.

35. Defendant MOSS recruited some victim\investors by taking advantage of their religious beliefs:

    a. Defendant MOSS ran an investment meeting after a weekly Bible study at a church in Phoenix.

    b. On or about November 14, 2012, Defendant MOSS called victim\investor L.O. to solicit L.O.'s investment in the low-alpha lead venture. Defendant MOSS professed his faith to L.O. and L.O. believed him.

    c. Investor J.B. believed MOSS because MOSS represented to J.B. that he was a Christian.

    d. Defendant MOSS solicited victim\investor T.S. to invest in low-alpha lead located in a Catholic church in Central America. T.S. invested with Defendant MOSS because MOSS represented that he was a devout Christian and T.S. trusted him.

36. While he professed his purported religious faith to L.O., J.B. and T.S. as he solicited investments from them, Defendant MOSS did not inform them of the 2008

8

California Desist and Refrain Order that found he committed securities fraud.

37. After victim\investor T.S. invested and after T.S. received only $750 in payment, T.S. followed up with MOSS about the status of his investment. In December 2014, Defendant MOSS emailed T.S. that "no one has ever lost a dime [with] us," when Defendant MOSS knew this statement to be false and misleading. Defendant MOSS did not tell T.S. that the Foundation had defaulted on promissory notes due and payable to at least eight (8) other investor\victims.

38. On or before November 20, 2012, Defendants MOSS, MCHATTON and SPROAT solicited an investment in the low-alpha lead from victim\investor J.C. Defendant MOSS told J.C. that he had located bricks of low-alpha lead in the basement of a Catholic church in South America that they could purchase. Defendant MOSS claimed to be working with a priest from the church. Defendant MOSS falsely promised J.C. that there was absolutely no risk involved in the investment and that Defendant MOSS guaranteed the returns. Defendants MCHATTON and SPROAT assured J.C. the investment was real.

39. Prior to J.C. investing in the low-alpha lead, Defendant MOSS told victim\investor J.C. that the Foundation had recovered sunken gold and gave all the money to Charity, which was false.

40. On or about November 20, 2012, victim\investor J.C. wired $50,000.00 to Defendant MCHATTON's Quicksilver Realty account ending in 4993.

41. On or before October 31, 2012, Defendants MOSS, MCHATTON, and

9

SPROAT met with victim\investor M.M. to solicit funds for the low-alpha lead investment.

42. During the meeting with M.M. Defendants MOSS, MCHATTON, and SPROAT falsely stated to victim\investor M.M. that the lead investment was ready to go, that the rights and licenses had been acquired, everything was secured and that M.M.'s funds would be used to transport the low-alpha lead investment to the United States.

43. On or about October 31, 2012, M.M. wired $75,000 to MCHATTON's Quicksilver Realty account ending in 4993.

44. After the Foundation's promissory note became due, M.M. inquired about his investment; MCHATTON told M.M. that they could not get permits for the low-alpha lead.

45. On or about November 14, 2012, after Defendant MOSS solicited an investment from victim\investor L.O., L.O. wired $100,000.00 to MCHATTON's Quicksilver Realty account ending in 4993 to invest in low-alpha lead.

46. Approximately one week later, L.O. learned negative information about the Foundation's joint venture partner and confronted Defendant MOSS; MOSS falsely stated to L.O. that the joint venture partner was no longer in a position to affect the investment.

47. However, Defendant MOSS had wired the joint venture partner approximately $80,000 of L.O.'s funds on or about November 16, 2012, and would wire more victim\investors' funds to the joint venture partner throughout December 2012.

48. On or before January 9, 2013, Defendants MOSS and MCHATTON solicited victim\investor P.B. to invest in the low-alpha project with Wycliffe. Defendant MOSS

falsely represented, "The technical and security teams visited the site the week of 11/12/2012 and brought back several 8-pound bars."

49. Defendant MOSS' false representation regarding samples of the low-alpha lead was important information to P.B.'s decision to invest.

50. On January 9, 2013, P.B. wired $50,000.00 to MCHATTON's Quicksilver Realty account ending in 4993.

51. In exchange, P.B. received a Promissory Note and a Memorandum of Understanding from the Foundation and signed by Defendants MOSS, MCHATTON and SPROAT. In the Promissory Note and a Memorandum of Understanding, Defendants MOSS, MCHATTON and SPROAT represented that the Foundation would use at least 85% of P.B.'s $50,000.00 investment to further the Joint Venture Agreement with Wycliffe.

52. Defendants MOSS, MCHATTON and SPROAT did not use any of P.B.'s $50,000 investment for the low-alpha lead project or any other venture with Wycliffe.

53. Instead, between January 10, 2013, and February 22, 2013, Defendant MCHATTON misused at least $42,068 of P.B.'s $50,000.00 investment by transferring $21,625.00 to MCHATTON'S other personal and business bank accounts, making ATM and bank withdrawals of at least $18,900.00 cash, and paying for MCHATTON's personal expenses such dining, flowers and hotels in Phoenix.

54. Based on the Foundation's investment contracts for the low-alpha lead project, it was supposed to have repaid M.M., L.O., J.C., J.B., T.S. and P.B. all their

11

collective $425,000.00 principal investment amounts by no later than April 19, 2013.

55. By April 19, 2013, however, the Foundation had defaulted on all those investment contracts for the low-alpha lead project.

56. On or before April 25, 2013, Defendants MOSS, MCHATTON, and SPROAT met with victim\investor M.F. in Tucson to solicit funds for the low-alpha lead investment. MOSS told M.F. to expect a return of five times the amount of his investment within 90 days.

57. Defendants MOSS, MCHATTON, and SPROAT did not disclose to M.F. that the Foundation was in default on all its previous investment contracts for the low-alpha lead project.

58. Between on or about April 25, 2013, and on or about May 23, 2013, M.F. invested approximately $44,000.00 in the low-alpha lead project. M.F. gave Defendant MOSS $5,000.00 cash and checks in the amount of $39,000.00, including a $26,000.00 check from the refinance of his home. The checks were deposited into Defendant MCHATTON's Quicksilver Realty account ending in 4993.

59. MOSS, MCHATTON and SPROAT did not use any of M.F.'s $44,000.00 investment for the low-alpha lead project.

60. Prior to making their investments, Defendant MOSS falsely represented to some of the investors that "we/TFF [the Foundation] have already invested $250 K into our previous partnership and an additional $125 K in this [low-alpha lead] project." This representation was false because: (i) the Foundation had no revenue, no income and no

12

assets; and (ii) the records for the bank accounts Defendants MCHATTON and MOSS used for the Foundation and themselves do not reflect any evidence of such investments by Defendants or the Foundation.

### The Philippine Gold Recovery, Part II; The Conversion of Low-Alpha Lead to Philippine Gold

61. Beginning on or about May 2013, Defendants MOSS, MCHATTON, and SPROAT began executing a "Revenue Sharing Agreement" and an "Irrevocable Assignment of Revenue Sharing Interest" with victim\investors. Defendants exchanged the Promissory Notes with victim\investors for revenue sharing units in the Philippine Gold recovery investment.

62. About 90 days after victim\investor L.O. wired $100,000.00 to Defendant MCHATTON's bank account for L.O.'s investment in low-alpha lead, Defendant MOSS told L.O. that the town where the low-alpha lead was located would not give permission to mine the low-alpha lead. Defendant MOSS offered to apply L.O.'s $100,000.00 to the Philippine Gold investment instead.

63. On or about April 26, 2013, Defendant MOSS emailed victim\investors T.B. and P.B with an offer to convert their low-alpha lead investment into revenue shares in the Philippine Gold investment. Under Defendant MOSS's offer, if T.B. and P.B. converted their $125,000.00 investment in the low-alpha lead to revenue shares in Philippine Gold, the projected financial return was approximately $5,853,125.00, plus a $500,000.00 bonus if they converted to the Philippine Gold investment by May 3, 2013.

64. In March or April 2013, an associate of Defendant's MOSS, SPROAT, and

13

MCHATTON showed investor\victims F.D. and C.D. a video about the Philippine Gold recovery project and they were falsely led to believe their investment funds would be invested in the Philippine Gold Recovery project.

65. On May 15, 2013, Defendant SPROAT emailed to F.D. and C.D. several documents concerning the Foundation and the Philippine Gold project, including a "Summary Financing Proposal – Supplementary Financial Information" ("Supplementary Financial Information"). F.D. and C.D. read the documents. The Supplementary Financial Information projected that a $100,000.00 investment would yield a return of $5,315,000.00.

66. Defendants MOSS, MCHATTON and SPROAT did not disclose to F.D. and C.D. that:

    a. the Foundation had not paid any returns to T.B. and P.B. for their June 2012 $250,000.00 investment in the Philippine Gold project; or

    b. the Foundation had defaulted on all its investment contracts for the low-alpha lead project, except the recent investment by M.F. which was not yet in default.

67. On or about May 16, 2013, F.D. and C.D. wired $100,000.00 to Defendant MCHATTON's Quicksilver Realty account to invest in what they believed was the Philippine Gold project.

68. In exchange, F.D. and C.D. received a Promissory Note and a Memorandum of Understanding from the Foundation and signed by Defendants MOSS, MCHATTON

and SPROAT. In the Memorandum of Understanding, Defendants MOSS, MCHATTON and SPROAT represented that the Foundation would use F.D. and C.D.'s $100,000.00 investment to further the Joint Venture Agreement with Wycliffe, and that F.D. and C.D.'s profits would "come from the business ventures between [the Foundation] and Wycliffe." Defendants' representations were consistent with F.D. and C.D.'s belief they were investing in the Philippine Gold project.

69. However, F.D. and C.D.'s money was not transferred to Wycliffe accounts for investment in the Philippine Gold recovery investment; instead, at least $81,773.00 of F.D. and C.D.'s $100,000.00 investment was wired from Defendant MCHATTON's Quicksilver Realty account to George H. LaBarre Galleries, which is unrelated to Wycliffe and the Philippine Gold project.

70. The same day F.D. and C.D. wired their $100,000.00 to Defendant MCHATTON's Quicksilver Realty account, $3,000.00 was transferred from that account to Defendant MOSS' bank account for his company, TMC Consultants.

71. Defendant MOSS did not inform F.D. and C.D. that he got $3,000.00 the same day they provided their investment money.

72. F.D. and C.D. have not received any repayment of their $100,000.00.

### The "Fast Freddy"

73. On or after August 4, 2013, Defendant SPROAT met R.S. and M.S. at their open house while they were selling their home. R.S. is a minister. Defendant SPROAT told R.S. that he had a pastor in his family and they struck up a conversation.

15

SPROAT started talking about investing with the Foundation.

74. Defendant SPROAT told R.S. and M.S. that he could get them in on a last minute "Fast Freddy" investment, which was set to pay out a guaranteed 100% return on their money plus their original investment.

75. Defendant SPROAT gave R.S. and M.S. promotional documents that represented the Foundation as a non-profit corporation that distributed 90% of its net earned income to further philanthropic and humanitarian causes, and that "has developed financial strategies via joint ventures to be able to … advance His Kingdom by creating exponential returns through various well-established and/or exclusive Joint Venture projects and asset management opportunities."

76. Those representations were false. Since at least 2012, the Foundation has never had any "net earned income," and it has never generated investment returns, let alone "exponential" ones.

77. The promotional documents represented, "Moss is known for his work in initiating and supporting programs and entities based upon 'values' and 'ethics' through charities," but they did not disclose the 2008 California Desist and Refrain Order finding that MOSS committed securities fraud.

78. On or about August 06, 2013, R.S. and M.S. invested $25,000.00 in the "Fast Freddy" investment with TFF. Their $25,000.00 was deposited to Defendant MCHATTON's Quicksilver Realty account.

16

79. The next day, August 7, 2013, Defendant MCHATTON made transfers and a cash withdrawal from his Quicksilver Realty account ending in 4993, which totaled $22,500.00. Of that $22,500.00, at least $20,197.60 consisted of R.S. and M.S.'s investment funds.

80. Defendant MCHATTON transferred $15,000.00 of the $22,500.00 to other accounts he controlled, including a $4,500.00 transfer to his and his wife's personal checking account. MCHATTON used the $4,500.00 to pay his house rent, utilities, cable television service and cell phone service. MCHATTON gave $7,500.00 of the cash he withdrew to Defendant MOSS.

81. R.S. and M.S. have never received any repayment of their $25,000.00.

### The African Diamond

82. On or before September 2014, Defendants MOSS and SPROAT met with victim\investor N.B. to solicit funds for an investment that purportedly involved a very large diamond in Africa. N.B. was misled into believing that he was investing in a family that was too poor to have the large diamond processed or cut for sale, so they needed investors.

83. Defendants MOSS and SPROAT falsely stated to N.B. that if he invested $100,000.00, after 90 days he would start receiving his money back and he would receive returns of 120 percent per year.

84. Between on or about September 24, 2014, and October 7, 2014, N.B.

17

invested $100,000.00 that he believed would be used to invest in the African Diamond.

85. In return, N.B. received a "Profit Participation In Revenue Share Agreement" signed by Defendants MOSS and MCHATTON as the Foundation's directors, which promised to repay $100,000.00 plus "profit participation."

86. N.B. also received a Lender's Memorandum, dated September 30, 2014. It stated that the profits from what N.B. believed to be an investment in the African Diamond were supposed to be distributed based on the amount invested.

87. N.B invested money in the African Diamond investment, but N.B. did not perform any duties.

88. When N.B. invested, Defendants MOSS, MCHATTON and SPROAT did not disclose to him that the Foundation was in default on all its promissory notes and investment contracts with its previous investors because it had failed to timely repay them their principal let alone the promised 500% returns.

89. When N.B. invested, Defendant MOSS did not disclose the 2008 California Desist and Refrain Order finding that MOSS committed securities fraud.

90. N.B. has never received any return of his $100,000.00.

91. When N.B. inquired about his investment, Defendant MOSS falsely stated to N.B. that the funds were frozen internationally and that greedy governments and banks were holding up the ability to pay investors.

92. Defendant MCHATTON used N.B.'s $100,000.00 to make at least $45,000.00 in cash withdrawals.

93.     Defendants MOSS, MCHATTON and SPROAT also used large amounts of victim\investor N.B.'s funds to pay for MOSS' mortgage, SPROAT's rent, and for other living expenses.

**Counts 1 - 10**
**Securities Fraud**
**Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17,**
**Code of Federal Regulations, Section 240.10b-5**

The factual allegations in paragraphs 1 through 93 of this indictment are re-alleged and incorporated by reference as if fully set forth herein.

94.     On or about the dates alleged below, in the District of Arizona and elsewhere, the Defendants, ROBERT J. MOSS, JEFFREY D. MCHATTON, and ROBERT B. SPROAT, knowingly and willfully, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, would and did use and employ, in connection with the purchase and sale of securities, that is Promissory Notes and Memorandums of Understanding, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of conduct which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and purchasers of the Promissory Notes and Memorandums of Understanding, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section

240.10b-5; as set out below:

| COUNT | DATE | INVESTOR | AMOUNT | INVESTMENT |
|---|---|---|---|---|
| 1 | 10/31/2012 | M.M. | $75,000 | Low-Alpha Lead |
| 2 | 11/14/2012 | L.O. | $100,000 | Low-Alpha Lead |
| 3 | 11/20/2012 | J.C. | $50,000 | Low-Alpha Lead |
| 4 | 12/4/2012 | J.B. | $100,000 | Low-Alpha Lead |
| 5 | 12/19/2012 | T.S. & K.S. | $50,000 | Low-Alpha Lead |
| 6 | 1/8/2013 | P.B. | $50,000 | Low-Alpha Lead |
| 7 | 4/25/13 to 5/23/13 | M.F. | $44,000 | Low-Alpha Lead |
| 8 | 5/16/2013 | F.D. and C.D. | $100,000 | Philippine Gold Recovery |
| 9 | 8/6/2013 | R.S. and M.S. | $25,000 | "Fast Freddy" |
| 10 | 9/24/14 to 10/7/14 | N.B. | $100,000 | African Diamond |

A TRUE BILL

s/
Presiding Juror

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

**REDACTED FOR PUBLIC DISCLOSURE**

/s/

Assistant U.S. Attorney

Date: OCT 31 2018

20